GARMAN TURNER GORDON LLP
GREGORY E. GARMAN
Nevada Bar No. 6654
E-mail: ggarman@gtg.legal
GERALD M. GORDON
Nevada Bar No. 229
E-mail: ggordon@gtg.legal
MARK M. WEISENMILLER
Nevada Bar No. 12128
E-mail: mweisenmiller@gtg.legal
650 White Drive, Suite 100
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*[Proposed] Attorneys for Debtor*

COZEN O'CONNOR
THOMAS J. FRANCELLA
Delaware Bar No. 3835
*Pro Hac Vice Pending*
E-mail: tfrancella@cozen.com
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Telephone: 302.295.2000
Toll Free Phone: 888.207.2440
Facsimile: 302.295.2013
*[Proposed] Attorneys for Debtor*

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>Jagged Peak, Inc., a Nevada corporation,<br><br>Debtor. | Case No.: BK-S-19-15959-MKN<br><br>Chapter 11<br><br>Hearing Date: OST Pending<br>Hearing Time: OST Pending |

**OMNIBUS DECLARATION OF JEREMY ROSENTHAL IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Jeremy Rosenthal, declare as follows:

1. I am the Chief Restructuring Officer of TradeGlobal North America Holding, Inc., a Delaware corporation and its wholly owned subsidiary TradeGlobal, LLC, a Delaware limited liability company (collectively, "TradeGlobal") and Jagged Peak, Inc., a Nevada corporation ("Jagged Peak") (collectively, the "Debtors"). In that capacity, I oversee the financial management of the Debtors. An organizational chart of the Debtors (the "Organizational Chart") is attached hereto as Exhibit A.

2. I submit this declaration (this "Declaration") in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the various motions filed on the date hereof (the "Petition Date") seeking various

4840-5363-7798, v. 1

types of "first day" relief (collectively the "First Day Motions"). The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors-in-possession and minimize the adverse effects of the chapter 11 filings on their businesses. I am familiar with the contents of each First Day Motion and believe the relief sought therein is (i) necessary to enable the Debtors to operate their businesses during the pendency of these cases (the "Chapter 11 Cases") with minimal disruption or loss of productivity and value, (ii) are critical to achieving a successful restructuring of the Debtors' financial affairs, and (iii) are in the best interests of the Debtors, their estates and all stakeholders. The facts set forth in each of the First Day Motions are incorporated herein by reference.

3.  My firm, Force Ten Partners, LLC ("Force 10") has been the financial advisor for the Debtors since July 12, 2019 and I was appointed the Chief Restructuring Officer of the Debtors on September 15, 2019. I am not a member of the board of directors of any of the Debtors and I am not an owner of any of the Debtors. I am a partner with Force 10. Before joining Force 10, I practiced law in the areas of bankruptcy and financial restructuring for over 16 years and have represented debtors, creditors and other parties-in-interest in bankruptcy cases. I have considerable experience and knowledge of the business and legal issues surrounding insolvency, reorganizations, liquidations, and related matters, including investigating the circumstances contributing to a debtor's financial distress. I am currently the chief restructuring officer and chief executive officer of Warrior Custom Golf, Inc., which is a debtor in a chapter 11 case that is currently pending in the Southern District of Texas.[1]

4.  Since the Debtors' retention of Force 10, I have attempted to become familiar with the Debtors' day-to-day operations, books and records and financial affairs. In view of my recent involvement, my investigation of the Debtors' operational history, current business activities, capital structure and organizational documents is ongoing and my knowledge and understanding of those areas is evolving. Except as otherwise indicated, the facts set forth in this

---

[1] Warrior Custom Golf, Inc. is one of sixteen debtors in cases that are jointly administered under the caption *In re Westwind Manor Resort Association, Inc., et al.*, Case No. 19-50026 (Bankr. S.D. Texas).

4840-5363-7798, v. 1

Declaration are based on: (a) personal knowledge of the Debtors' businesses, employees, operations, and finances that I have obtained in the short time since Force 10 was retained; (b) information learned from my review of relevant documents; (c) my discussions with members of the Debtors' senior management and other professionals; (d) information provided to me by Force 10 personnel working under my supervision; and (e) or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial condition. If called upon to testify, I would testify competently to the facts set forth in this Declaration and the First Day Motions. I am authorized to submit this Declaration on the Debtors' behalf.

## I. BACKGROUND

**A.    The Debtors' Business and Operations**

5.    The Debtors are in the business of supporting clients' e-commerce operations by harnessing technology and nearly 800 dedicated and hard-working rank-and-file employees to process, fulfill and ship consumer and medical goods across the United States. The Debtors are led by shared senior management headquartered at 7650 W. Courtney Campbell Causeway, Suite 1200 in Tampa, Florida. Currently, the Debtors share a chief executive officer, a chief financial officer, a chief technology officer and critical treasury, accounting, human resources and other shared services.

6.    TradeGlobal and Jagged Peak work closely with one another in conducting their business operations. TradeGlobal and Jagged Peak share certain relationships with key suppliers and Jagged Peak contracts with TradeGlobal for it to pack and ship goods in the Midwest region of the United States for Jagged Peak's largest customer. TradeGlobal utilizes Jagged Peak's sophisticated EDGE™ software platform to fulfill orders for Jagged Peak efficiently and cost effectively.

. . .

. . .

4840-5363-7798, v. 1

**Jagged Peak, Inc.**

7. Jagged Peak was incorporated in Nevada in 1999 as Benchmark Technology Corporation. In 2005, Benchmark Technology Corporation changed its name to Absolute Glass Protection, Inc. Later in 2005 it changed its name to Jagged Peak, Inc., substantially contemporaneously with its merger with a Florida corporation also named Jagged Peak, Inc. in addition to its operation in Tampa, Florida, Jagged Peak leases warehouse space in St. Petersburg, Florida and Woodbridge, New Jersey and contracts with other logistics companies (including TradeGlobal) throughout the United States.

8. Jagged Peak is a logistic company with multi-national clients serviced by its proprietary software product, EDGE™ (Enterprise Dynamic Global Engine), which enables companies to control and coordinate multi-channel[2] orders, catalogs, multi-warehouse inventories, and delivery across multiple customers, suppliers, employees, locations, and partners. The EDGE™ platform is a critical competitive advantage for Jagged Peak.

9. The EDGE™ platform allows Jagged Peak to facilitate all aspects of their clients' e-commerce operations, including order processing, warehousing and shipping. The EDGE™ platform also manages associated administrative functions related to these e-commerce operations and holds detailed current and historical customer data used by clients to anticipate growth and continually strive to better meet the needs of their customers. Jagged Peak works with a number of internationally recognized brands, including Kind, Nespresso, Assouline, Coravin, Tom Ford, and Birkenstock. Nespresso accounts for over eighty (80) percent of Jagged Peak's revenue.

10. EDGE™ is a cloud-based e-commerce platform that connects front-end and back-end systems for a complete, 360-degree view of customers' orders and inventory from every distribution channel. The following graphic summarizes the various functions that EDGE™ performs:

---

[2] In this context, "channel" refers to a means of distribution of goods, such as online, catalogue, or sale at a traditional brick and mortar retailer.

Page **4** of **15**

4840-5363-7798, v. 1

[Diagram of EDGE™ platform showing Sales Channels (eCommerce Platforms, Marketplaces, Stores, Wholesale, Customer Service, B2B) connecting to EDGE (Product Management (PIM), Storefront Management, Order Management, Inventory Management, Customer Management, Reporting & Analytics, Fulfillment, Payment Processing) connecting to Back-End Integration (Warehouse Management, 3PL Management, Supplier Management, Drop-Shippers) and Shipping Integration (Transportation Management, TMS — Performs Rate Shopping, Shipping Labels, Ship Confirms). Notes: EDGE Synchronizes Products, Orders, Customers & Inventory; Auto-Publish Products to All Channels; Customer Information Store ID / Product Data Sales; ERP / Accounting Integration; EDGE Provides Real-Time Catalog & Inventory Updates; EDI/CSV Imports Rules to Clean Data.]

11. In addition to the EDGE™ platform, Jagged Peak manages warehouses where it stores, packs and ships over $900 million in goods for clients every year. Jagged Peak manages all facets of a customer's e-commerce operations from order processing, selecting items, packing boxes and shipping orders for final delivery by third-party shipping companies (like UPS, one of the Debtors' largest creditors and trusted vendors).

12. As of the Petition Date, Jagged Peak's workforce was comprised of 119 hourly employees and 88 salaried employees

13. Jagged Peak's payroll averages approximately $515,000.00 every two (2) weeks. In addition, it has temporary labor costs of approximately $135,000.00 per week.

14. In the thirty (30) days following the Petition Date, Jagged Peak projects that payroll will total $1,440,303.00 for non-executive employees, $303,848.00 for senior executives, and $13,000.00 for independent directors.

**TradeGlobal LLC**

15. TradeGlobal was formed as a Delaware limited liability company in 2011 under the name Netrada North America LLC. Later in 2011, it was the surviving entity of a merger with Fulfillment Technologies, LLC, and in 2014 it changed its name to TradeGlobal LLC. TradeGlobal provides e-commerce support and fulfillment. It provides essential logistics services (pick, pack, and ship) for clients such as Versace, Acushnet (Titleist), Puma, and Kidbox.

16. TradeGlobal also provides a sophisticated software as a service (SaS) platform called Cross-Border. Cross-Border enables TradeGlobal's customers to sell and ship products

Page 5 of 15

4840-5363-7798, v. 1

from the United States into international markets by managing shipping costs, tariffs and duties, and supporting the customer in complying with foreign laws and regulations.

17. As of the Petition Date, TradeGlobal's workforce was comprised of 465 hourly employees, 114 salaried employees, and two (2) executives.

18. TradeGlobal's payroll averages approximately $1 million every two (2) weeks. In addition, it has temporary labor costs of approximately $155,000.00 per week. Jagged Peak and TradeGlobal's bi-weekly payrolls occur on alternating weeks.

19. In the thirty (30) days following the Petition Date, TradeGlobal projects that payroll will total $2,501,128.00 for non-executive and temporary employees, $154,814.00 for senior executives, and $13,000.00 for independent directors.

20. In addition to its headquarters in Tampa, Florida, TradeGlobal operates out of three leased warehouses in Ohio (West Chester, Cincinnati, and Fairborn). At the end of September 2019, TradeGlobal's lease for its warehouse located in Cincinnati will expire. TradeGlobal is currently in the process of vacating that warehouse and anticipates being out of the facility before the termination of its lease.

**B.    Pre-Petition Capital Structure**

**Organizational Structure and Management**

21. The Debtors are indirect subsidiaries of Singapore Post Limited, a limited corporation under the laws of Singapore ("SingPost") and publicly traded on the Singapore Exchange under symbol S08. SingPost provides domestic and international postal services in Singapore and also provides logistic services. SingPost utilizes the EDGE™ platform for its customers. In 2015, through its wholly-owned subsidiary SP Commerce Holdings, Inc., SingPost acquired a 97.3% interest in TradeGlobal Acquisition Corp., which is the sole shareholder of TradeGlobal Holdings, Inc., which is the sole shareholder of the Debtor TradeGlobal North America Holding, Inc. ("TradeGlobal North America") and TradeGlobal, LLC.

4840-5363-7798, v. 1

22. In the same week in which it acquired TradeGlobal, SingPost, through its wholly-owned subsidiary SP Jagged Peak LLC acquired a 71.1% interest in Jagged Peak. In February 2019, SP Jagged Peak LLC acquired the remaining 28.9% of the Jagged Peak stock.

23. As of the Petition Date, TradeGlobal North America's board of directors consisted of the following individuals: (i) Michael Mercier (the chief executive officer of TradeGlobal and Jagged Peak); (ii) Daniel Ludwig (the chief financial officer of TradeGlobal and Jagged Peak); (iii) Douglas Garrett (a newly appointed independent director); and (iv) Jeffrey Golden (a newly appointed independent director).

24. As of the Petition Date, Jagged Peak's board of directors consisted of the following individuals: (i) Michael Mercier; (ii) Paul William Coutts; (iii) Lak "Richard" Tak Loi; (iv) Douglas Garrett; and (v) Jeffrey Golden.

25. Messrs. Coutts and Lai are, respectively, are the group chief executive officer and chief financial officer of SingPost.

26. By September 2019, there were discussions regarding possible additional financing to be provided by SingPost, as well as ongoing efforts to sell SingPost's equity interests in Jagged Peak. Because of concerns about actual or perceived conflicts of interest, the boards of directors of TradeGlobal North America and Jagged Peak created special committees of their respective boards comprised of Douglas Garrett and Jeffrey Golden as the sole independent directors, and empowered the special committees to evaluate the restructuring options of their respective companies and authorized the special committees to commence Chapter 11 proceedings, among other matters, in their discretion.

**Pre-Petition Debt**

27. With the possible exception of a small number of equipment leases, the Debtors do not have any secured indebtedness.

28. As of the Petition Date, Jagged Peak had outstanding unsecured loan obligations of:

a. Approximately $9,500,000.00 owed to SingPost under the terms of that certain Loan Facility Agreement For A Combined Limit Of Up To U.S.$10,000,000 dated January 31, 2019 (the "SPL Facility"), pursuant to which SingPost agreed to loan the Debtors up to the aggregate amount of $10,000,000.00; and

b. Approximately $17,000,000.00 owed to JP Morgan Chase ("JP Morgan") under that certain End of the Day Loan Sweep Facility dated September 25, 2018 (the "JPM/Jagged Peak Facility"), pursuant to which JPM agreed to loan Jagged Peak up to $17,000,000.00.

29. As of the Petition Date, TradeGlobal had outstanding unsecured loan obligations of:

a. Approximately $500,000.00 owed under the SPL Facility; and

b. Approximately $33,000,000.00 owed to JPM under that certain End of the Day Loan Sweep Facility dated September 25, 2018 (the "JPM/TradeGlobal Facility"), pursuant to which JPM agreed to loan TradeGlobal up to $33,000,000.00.

30. The Debtors' obligations under the JPM/Jagged Peak Facility and JPM/TradeGlobal Facility (collectively, "JP Morgan Facilities") are guaranteed by SingPost, and secured by letters of credit posted by SingPost in the aggregate amount of $50,000,000.00.

31. In addition to the foregoing, as of the Petition Date Jagged Peak and TradeGlobal had outstanding accounts payable in the amounts of approximately $9.2 million and $7.9 million as of September 13, 2019, respectively.

**C.  Events Leading to Bankruptcy Filing**

32. Jagged Peak and TradeGlobal have experienced sustained operating losses over a number of years due to, among other things, a lack of working capital sufficient to sustain current operations, maintain existing customers and meet capital needs. The lack of working capital was compounded by a series of unprofitable contracts and continued investments in the

4840-5363-7798, v. 1

EDGE™ platform. The SPL Facility itself was used by JP to fund operating losses and begin an operational turnaround initiative that significantly reduced expenses but was insufficient to avoid JP's insolvency.

33. Jagged Peak and TradeGlobal have relied on the JP Morgan Facilities and aggressive cash management to fund their operations. However, upon the funding of the JP Morgan Facilities, SingPost caused TradeGlobal to transfer $29,000,000 of the $33,000,000 available under the JPM/TradeGlobal Facility to SingPost.

34. In April 2019, SingPost publicly announced its intention to pull out of the U.S. market. This announcement coupled with the Debtors' distressed financial condition has led many customers to terminate their contracts with the Debtors, accelerating the Debtors' financial distress.

35. In the intervening months, the Debtors, provided due diligence information to investment bankers retained by SingPost. As of the Petition Date, however, the equity sale process for either Debtor had not been successful and the Debtors lack liquidity to continue to operate outside of the protections of Chapter 11.

36. On July 12, 2019, the Debtors retained Force 10 to assist with efforts to evaluate the viability of the Debtors' businesses and possible restructuring and sale alternatives.

37. The Debtors have concluded that the best way of preserving value for the benefit of all parties in interest is to seek protection under chapter 11 of the Bankruptcy Code. This will not only afford the Debtors the opportunity to stabilize and preserve the value of their business and explore restructuring alternatives, but to avoid the irreparable harm to their customers if the Debtors' were to cease operations, especially given the upcoming Holiday Season. The logistics services provided to their customers, particularly their larger customers, cannot be replaced on short notice.

38. Attached as Exhibit B is a cash flow projection for the Debtors' operations through April 3, 2020. As set forth therein, for the initial 60 days following the Petition Date, the Debtors revenues combined with their cash reserves are projected to be sufficient to maintain post-Petition Date operations. One or more DIP loans pursuant to Section 364 of the Bankruptcy Code are contemplated to meet each Debtor's funding needs thereafter. The Debtors are confident that given the capital structure of the Debtors and the lack of any secured debt, a DIP loan on fair and reasonable terms providing sufficient liquidity to maintain operations during this reorganization process is achievable.

## II. FIRST DAY MOTIONS

39. The Debtors have filed or expect to file the First Day Motions described below. The following is only intended to be a summary of the First Day Motions. The full grounds for the relief sought in the First Day Motions is set forth in each of the same.

**A.  Motion of Debtors for an Order Granting and Extension of Time to File Schedules of Assets and Liabilities, Statement of Financial Affairs and Lists of Executory Contracts and Unexpired Leases**

40. The Debtors are seeking entry of an order extending the deadline by which the Debtors are required to file their schedules and statements of financial affairs (collectively, the "Schedules"). The Debtors request that such deadline be extended to the date that is forty-five (45) days following the Petition Date.

41. Preparation of the Schedules requires gathering and reviewing a substantial volume of books and records. In the days immediately following the Petition Date, the Debtors' employees and professionals' efforts will necessarily be focused on stabilizing operations, communicating with customers, and trying to limit the disruptive effects of the bankruptcy filings on the Debtors' operations.

. . .

4840-5363-7798, v. 1

42. Given the Debtors' resources, and in light of the time that will need to be devoted to other tasks necessary to protection of the value of the estates, it is unlikely that the Debtors will be able to complete the Schedules within fourteen (14) days of the Petition Date.

### B. Emergency Motion for Order Directing Joint Administration of Debtors' Chapter 11 Cases Under Federal Rule of Bankruptcy Procedure 1015(b)

43. The Debtors are seeking entry of an order directing that their cases be jointly administered.

44. It would be more efficient if these cases were jointly administered, in part, because the Debtors anticipate that most motions, applications, and hearings will apply to each of the cases to a large extent.

45. Joint administration will promote the economical and efficient administration of the cases.

46. The Debtors are only seeking joint administration for procedural purposes, and are not presently requesting that these cases be substantively consolidated. Joint administration, therefore, will not impair any creditors' right to recovery from the assets of any particular Debtor, and will not otherwise adversely affect any creditor or other party in interest.

### C. Motion of the Debtors for Entry of an Order (i) Authorizing Continued Use of Existing Bank Accounts, Business Forms and Purchase Card Program; and (ii) Waiving the Requirements of Section 365(B) on an Interim Basis; and (iii) Granting Related Relief ("Cash Management Motion")

47. The Debtors seek entry of an order authorize them to maintain their existing bank accounts and to continue using existing business forms, and to continue using their cash management systems.

48. The Debtors maintain a cash management system in the ordinary course of business that allows for the efficient collection and application of funds. As of the Petition Date, the Debtors had ten (10) bank accounts which are set forth on Exhibit B to the Cash Management Motion (collectively, the "Accounts").

49. The Debtors utilize the Accounts in connection with their cash management system. Also part of that system is the Debtors' utilization of a Purchase Card Program with Fifth Third Bank. Per that program, certain of the Debtors' employees are provided with, and authorized to use, credit cards in the course of their employment duties. Those credit cards are paid for by the Debtors, rather than the employees themselves. In connection with the Purchase Card Program, the Debtors maintain a separate $500,000 account with Fifth Third Bank to cover credit card purchases. The Debtors' cash management system, use of the Accounts and the Purchase Card Program, is the most efficient means of managing revenues and expenditures, and maintaining that system and the Accounts will save costs and preserve the value of the estates. Administration of these cases will be substantially less disruptive and costly if the Debtors are permitted to continue depositing and withdrawing funds from the Accounts in the same manner as they did prior to the Petition Date, including, but not limited to, by check, wire transfer, ACH transfer, and other electronic funds transfers, and that the Accounts be treated for all purposes as debtor in possession accounts.

50. In the ordinary course of business, the Debtors use pre-printed check stock showing the name of the account holder, and also use pre-printed correspondence and business forms, such as letterhead, envelopes, invoices, and other forms (collectively, the "Business Forms"). To minimize undue administrative expense and delays, the Debtors request that they be permitted to use all existing Business Forms and not be required to include the designation "Debtor in Possession" or words of similar import on any such forms.

51. The Debtors have sophisticated bookkeeping practices and programs, and will be able to distinguish between pre and post-petition transactions, even while maintaining existing Accounts and systems, and will be able to accurately prepare such reports as are required under applicable law and operating guidelines.

. . .

. . .

4840-5363-7798, v. 1

D.  **Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay (I) All Prepetition Employee Obligations and (II) Prepetition Withholding Obligations, and (B) Directing Banks to Honor Related Transfers ("Wage Motion")**

52. The Debtors seek entry of an order authorizing payment of all employment-related obligations that become due and payable after the Petition Date, and to continue all employment practices, programs, and policies as were in effect on the Petition Date. The Debtors request that all banks be authorized and directed, as and when requested by the Debtors, to receive, process, honor, and pay any checks drawn on the Debtors accounts for the purpose of paying any employment-related expense.

53. As described in the Wage Motion, in the ordinary course of business, the Debtors have incurred various obligations to their employees that remained unpaid as of the Petition Date, including: (a) wages, salaries, and other compensation; (b) payroll taxes; (c) vacation and other paid time off programs; (d) 401(k) obligations; (e) health and welfare benefits; (f) the obligation to reimburse employees for expenses incurred by those employees in the course of their employment; and (g) miscellaneous other obligations incurred in the ordinary course of business.

54. Payment of employment-related obligations is necessary for the retention of the employees and maintaining worker morale, both of which are critical to preserving the value of the estates.

E.  **Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtors on Account of Prepetition Amounts Due; (II) Deeming Utility Providers Adequately Assured of Future Performance; (III) Authorizing the Debtors to Establish the Adequate Assurance Deposit Accounts and Pay the Adequate Assurance Deposits; (IV) Establishing Procedures for Objection to the Adequate Assurance Procedures; and (V) Granting Certain Related Relief ("Utilities Motion")**

55. The Debtors seek entry of an order: (a) prohibiting utility providers from altering, refusing, or discontinuing service on account of prepetition invoices; (b) approving the Debtors' proposed adequate assurance of future performance; and (c) establishing procedures for

4840-5363-7798, v. 1

determining adequate assurance of payment.

56. It is critical to the success of the Debtors' cases that utility services are not interrupted. Without continued utility services, the Debtors would not be able to operate their businesses, and the damages to the estates would be severe.

57. As set forth in the Utilities Motion, the Debtors have a history of timely paying for utility services, and they have proposed terms by which all utility providers will be adequately assured of the Debtors' performance of all post-petition obligations with respect to such services.

**F.  Application for an Order Approving Employment of BMC Group, Inc. as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date**

58. The Debtors seek entry of an order authorizing their retention of BMC Group, Inc. ("BMC") as claims and noticing agent. Employment of BMC is in the best interests of the estate and all parties in interest, as such employment will ensure that notices are provided and the claims registered is maintained as efficiently and economically as possible.

59. The Debtors have reviewed proposals from two other claims and noticing agents, and have determined that retention of BMC is the best option after a reasonable search.

Pursuant to 28 U.S.C. §1746, I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: September 17, 2019.

*/s/ Jeremy Rosenthal*
Jeremy Rosenthal

## **Exhibit A – Corporate Structure**

